FILED

**February 1, 2022**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **T.C.-1, T.C.-2, and T.C.-3**

**No. 21-0582** (Marion County 19-JA-192, 19-JA-193, and 19-JA-194)

**MEMORANDUM DECISION**

Petitioner Mother J.R., by counsel Jason T. Gain, appeals the Circuit Court of Marion County's June 25, 2021, order terminating her parental rights to T.C.-1, T.C.-2, and T.C.-3.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Mindy M. Parsley, filed a response in support of the circuit court's order. The guardian ad litem, Heidi M. George Sturm, filed a response on behalf of the children in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in terminating her parental rights without affording her a meaningful improvement period. Petitioner further argues that her counsel below provided ineffective assistance.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In December of 2019, the DHHR filed an abuse and neglect petition alleging that it received a series of referrals indicating that petitioner abused and neglected the children. According to the petition, petitioner's home lacked running water and electricity, and the children were unkempt with soiled skin, did not regularly bathe, and were seen wearing the same clothes for multiple days in a row. After a second referral, the DHHR alleged that the family was evicted due to nonpayment of rent, the electricity had been off for a month, and water services had ceased for the prior two months. The DHHR further alleged that T.C.-3 was born in the home, and it was unclear if there

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). Additionally, because the children share the same initials, they will be referred to as T.C.-1, T.C.-2, and T.C.-3, respectively, throughout this memorandum decision.

was birth certificate or other documents for the child. According to the petition, petitioner refused to go to the hospital after T.C.-3 was born, and the child was "shaking and red" for days after birth. The DHHR alleged that the parents would sleep during the day, allowing six-year-old T.C.-1 and four-year-old T.C.-2 to sneak out of windows in the home unattended.

The DHHR further alleged that petitioner was located in a hotel room with methamphetamine and drug paraphernalia in reach of the children. Child Protective Services ("CPS") workers arrived on the scene as law enforcement was arresting petitioner and observed the room to be extremely cluttered with clothing and garbage. A CPS worker alleged that she spoke with petitioner, who stated they had been living in the hotel for a week after being evicted from their prior residence. Petitioner stated she would move in with her mother but did not know when she would be moving. According to the petition, petitioner claimed she was scared of the children's father and that he had previously assaulted her. However, petitioner acknowledged that the father had been staying with her and the children periodically during their weeklong hotel stay. Petitioner further claimed that the drugs in the room belonged to the father. During the conversation with the CPS worker, petitioner disclosed that the children did not have a pediatrician, that T.C.-3 was born at home, and had not seen a doctor since his birth. Petitioner further acknowledged that T.C.-1 was not enrolled in school, and stated the child was not enrolled because she was uncertain where they would permanently live. According to the petition, the parents were arrested and incarcerated for child neglect creating risk of injury, and the father was arrested for possession with intent to deliver a controlled substance on December 3, 2019. The DHHR alleged that the parents were released a week later but neither parent contacted it to inquire about the children's wellbeing or to request visitation.

The circuit court held a series of adjudicatory hearings beginning in January of 2020. At the first hearing, the matter was continued pending paternity and maternity testing with respect to T.C.-3. The parents were ordered to participate in a drug screen following the hearing. Following the first adjudicatory hearing, the multidisciplinary team ("MDT") advised the parents that if they drug screened each day for the next two weeks, supervised visitation with the children could be arranged. The parents were also advised that if they tested positive for controlled substances, those levels would need to decrease over time to be granted visitation with the children. Petitioner participated in several drug screens over the two weeks, many of which were positive for methamphetamine and amphetamine.

According to a DHHR summary report, petitioner failed to participate in any drug screens from February 6, 2020, through February 18, 2020. The summary further indicated that petitioner and the father last appeared for drug screening on February 6, 2020, at the Marion County Day Report Center during which petitioner appeared to be "visibly[,] physically[,] and emotionally distraught." Petitioner advised the staff that she could not leave with the father, stating that he would try to kill her.

In March of 2020, the DHHR filed an amended petition alleging similar circumstances of abuse as previous alleged, adding that the children "appear to be in a situation where there is imminent danger due to pervasive substance abuse by both parents." The circuit court held an adjudicatory hearing in June of 2020 during which the parents stipulated to abusing and neglecting the children. They were both granted post-adjudicatory improvement periods.

At a status reviewing hearing in November of 2020, the DHHR reported that the parents did not participate in any drug screenings from July 17, 2020 through the end of September of 2020. The DHHR indicated that the parents entered into treatment programs at the end of August of 2020, and consistently participated in and tested negative on drug screens during the month of October. However, the DHHR demonstrated that the parents failed to participate in any screens from October 21, 2020, through the end of November of 2020. At a review hearing in February of 2021, the circuit court found that the parents had sporadically participated in individualized parenting and adult life skills classes and were still failing to consistently participate in drug screens.

The circuit court held dispositional hearings in April and June of 2021 during which the DHHR demonstrated that petitioner had tested negative on six drug screens performed in April and May of 2021. However, after missing several additional screens due to exposure to COVID-19, a CPS worker requested that petitioner participate in a drug screen following an MDT meeting in May of 2021. During the meeting, petitioner inquired "if it would make any difference at this point" by continuing to comply with drug screens. According to a court summary, a CPS worker explained to petitioner that the circuit court ordered petitioner to participate in the drug screens and that petitioner should continue to participate. Petitioner stated that she would continue to participate in screenings but failed to participate in the ordered screen after the meeting.

Next, the children's therapist testified that T.C.-1 and T.C.-2 exhibited angry and aggressive behavior toward each other and when discussing their parents. The therapist explained that the children suffered from childhood trauma and that T.C.-1 exhibited sexualized behaviors because she witnessed the parents having sexual intercourse.

Petitioner testified that she did not allow the children to watch adult television programming, nor did she expose them to sexual situations. Petitioner acknowledged that the proceedings began after she was found living in a motel where she abused drugs. Under questioning, petitioner noted that she was "conscientious of what her children were exposed [to] and she cannot explain why her children would make such 'horrible' statements about their life." Petitioner testified that she had no explanation for the children's memories, but they were "untrue," and claimed that she had a very close relationship with the children and that the family "traveled the country" while the father worked as a welding assistant on pipelines. Under questioning about drug screening, petitioner claimed that she missed several drug screens in January and February of 2021 because it was a hectic time and she had transportation issues. Petitioner further explained that she later made paying her bills a priority, and that is why she did not participate in screens in April of 2021. Finally, petitioner testified that she failed to participate in screens in May of 2021 because she had "lost hope" during the proceedings.

Based upon this evidence, the circuit court found that the primary reason for the removal of the children from the parents' care was substance abuse. The court further found that the parents were granted improvement periods, and each were provided three referrals for individualized parenting and adult life skills education classes. However, the court found that petitioner's services were closed in August of 2020 due to her noncompliance. The court found that petitioner eventually completed adult life skills and individualized parenting education classes in January of

3

2021, following a third referral. The court noted that petitioner was placed on probation as a condition of her deferred adjudication stemming from her criminal charge in January of 2021. As part of her probation, petitioner was required to participate in random drug screens, complete monthly check-ins, and comply with the terms of companion confidential cases. The court found that petitioner tested positive for methamphetamine and amphetamine in January of 2021 but did not inform the MDT of her positive screen, leaving CPS workers to learn about it through the probation office. The court further found that petitioner missed multiple drug screens in March of 2021 and was late to some hearings.

As a result, the court found that petitioner had not shown a significant desire to correct the conditions of abuse and neglect, that the matter had been pending for approximately eighteen months, and that petitioner made it clear that substance abuse is more important than the children. Accordingly, the court found that there was no reasonable likelihood petitioner could substantially correct the conditions of abuse and neglect in the near future and that termination of her parental rights was necessary for the children's welfare. As such, the circuit court terminated petitioner's parental rights.[2] It is from the June 25, 2021, dispositional order that petitioner appeals.

The Court has previously established the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner first argues that termination of her parental rights was inappropriate because she was not afforded a meaningful improvement period. According to petitioner, the DHHR's failure to allow her to visit her children during the improvement period "manifestly harmed the children and did nothing to 'foster an improved relationship between parent and child,' the very purpose of an improvement period." In support, petitioner argues that nothing required the circuit court to mandate compliance with drug screening or other services before granting petitioner visitation with the children. Finally, petitioner argues that the DHHR failed to "properly construct[] an improvement period and reunification plan" during the proceedings. We find,

---

[2]The father's parental rights were also terminated below. According to respondents, the permanency plan for the children is adoption in their specialized foster home.

4

however, that this assertion is simply insufficient to establish an error by the circuit court in regard to disposition, given petitioner's failure to fully comply with the services offered below.

Importantly, petitioner's argument fails to address how visitation with her children would have affected her failure to comply with multiple requirements of her improvement period, such as her failure to submit to drug screens, maintain contact with ("MDT") members and service providers, or failure to remain drug free. Moreover, there is nothing in the record to indicate that, absent her participation in these remedial services, petitioner's visitation with the children would have been in their best interests. Indeed, both of the older children exhibited angry and aggressive behavior toward each other when discussing the parents. The children's therapist testified this stemmed from childhood trauma. "'In a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided.' Syl. Pt. 2, *State ex rel. Lipscomb v. Joplin*, 131 W.Va. 302, 47 S.E.2d 221 (1948)." Syl. Pt. 3, *In re S.W.*, 233 W. Va. 91, 755 S.E.2d 8 (2014). Given that petitioner's conduct had a profoundly negative impact upon the children, and the evidence established that petitioner was unsuccessful in complying with services designed to remedy the conditions of abuse, we find no error in petitioner's lack of visitation with the children during the proceedings.

We similarly find no error in the termination of petitioner's parental rights, given that West Virginia Code § 49-4-604(c)(6) permits termination of parental rights when there is no reasonable likelihood that the conditions of abuse can be substantially corrected in the near future and when termination of parental rights is necessary for the children's welfare. According to West Virginia Code § 49-4-604(d)(3), a situation in which there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected in the near future includes when "[t]he abusing parent . . . ha[s] not responded to or followed through with a reasonable family case plan or other rehabilitative efforts of social, medical, mental health, or other rehabilitative agencies designed to reduce or prevent the abuse or neglect of the child." Here, the evidence overwhelmingly supports this finding, as set forth above. Further, as addressed above, the children's welfare required termination of petitioner's parental rights due, in part, to the extremely negative impact her abuse had on their wellbeing, particularly in light of her failure to correct her behavior. Moreover, this Court has held that

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] . . . that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). As such, we find that the circuit court did not err in terminating petitioner's parental rights.

Finally, petitioner argues that this Court should "use this case to determine the justiciability of ineffective assistance of counsel claims in child abuse and neglect cases." Petitioner acknowledges that this Court has declined to find ineffective assistance of counsel in prior abuse

5

and neglect proceedings but contends that this issue should be addressed in abuse and neglect proceedings in the same manner as other cases with the same constitutional standing and due process concerns.

Petitioner is correct that this Court has never recognized a claim of ineffective assistance of counsel in an abuse and neglect proceeding, and we decline to do so here, especially in light of the fact that, under the limited circumstances of this case, petitioner's counsel provided her with effective representation below. Petitioner first asserts that counsel below failed to object to a "concrete" family case plan. However, there is ample evidence in the record that petitioner was well aware of the requirements of her improvement period and was given many chances to comply with its terms and conditions. As such, counsel's failure to object to these case plans does not constitute ineffective assistance of counsel. Petitioner also argues that her counsel "waited until after [petitioner] had sent a pro se letter to the judge prior to filing a motion for visitation." However, the circuit court made clear from the onset of the proceedings that visitation would only be granted once petitioner was in compliance with the terms and conditions of her improvement period. Because petitioner was failing to maintain compliance throughout the proceedings, it was reasonable for petitioner's counsel to initially refrain from requesting visitation.

Further, petitioner contends that once the circuit court granted petitioner visitation, counsel below was deficient in accepting video visitation with the children—during the COVID-19 pandemic—instead of in-person visitation. First, petitioner does not dispute that counsel below filed a motion for visitation with the children, which was ultimately granted by the circuit court. While petitioner contends that virtual visitation was an insufficient substitute for in-person visitation, petitioner's lack of participation in the proceedings and compliance with the terms and conditions of her improvement period was the barrier to in-person visitation. Petitioner further does not dispute that the children were living in a foster home in Kanawha County, West Virginia, while petitioner lived in Marion and Harrison County during the proceedings. As such, the video visitations were arranged to allow petitioner to visit with the children in a safe and controlled setting, where both the guardian and CPS workers could supervise.

Moreover, upon a review of the record, there is no evidence that petitioner brought any of the issues regarding counsel's alleged ineffective assistance to the attention of the circuit court. "'Our general rule is that nonjurisdictional questions . . . raised for the first time on appeal, will not be considered.' *Shaffer v. Acme Limestone Co., Inc.*, 206 W.Va. 333, 349 n. 20, 524 S.E.2d 688, 704 n. 20 (1999)." *Noble v. W. Va. Dep't of Motor Vehicles*, 223 W. Va 818, 679 S.E.2d 650 (2009). Therefore, we find petitioner is not entitled to relief in this regard.

For the foregoing reasons, we find no error in the decision of the circuit court, and its June 25, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: February 1, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice Evan H. Jenkins
Justice William R. Wooton